**STATE of Alaska and Laura Glaiser, Director of the Division of Elections, Appellants,**

v.

**Michael I. JEFFERY and Nancy Nolan, Appellees.**

No. S–12101.

Supreme Court of Alaska.

Nov. 9, 2007.

Joanne M. Grace, Assistant Attorney General, Anchorage, and David W. Márquez, Attorney General, Juneau, for Appellants.

Jonathon A. Katcher, Pope & Katcher, Anchorage, for Appellee Michael I. Jeffery.

Eric T. Sanders, Feldman Orlansky & Sanders, Anchorage, for Appellee Nancy Nolan.

Before: MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

# I. INTRODUCTION

The question presented here is whether two sitting Alaska judges complied with AS 15.35.070 and .110, which require judges seeking retention in office to file "declarations of candidacy for retention" with the Alaska Division of Elections "no later than August 1." The two judges filed their declaration of candidacy forms after the statutory

filing deadline had passed. The Division of Elections determined that both judges were ineligible to stand for retention. The superior court ultimately concluded that the division had abused its discretion in making that determination because the judges had substantially complied with the filing requirements. Because we conclude that the division's determination was supported by the facts and had a reasonable basis in law, we reverse and order the judges to vacate their seats within ninety days after this opinion takes effect per Appellate Rule 507(b).

It is easy and natural to be sympathetic to the appellees, given both the harshness of the result and the appellees' outstanding record for public service as judges, but the outcome here is compelled by unambiguous statutes.

# II. FACTS AND PROCEEDINGS

Alaska judges wishing to retain their offices periodically stand for retention.[1] The Alaska Judicial Council (the council) is the agency charged with evaluating judges seeking retention and providing the public with information about those judges.[2] In November 2003 the council began the evaluation process for all possible 2004 retention candidates by sending questionnaires to each of the twelve judges who were potentially required to stand for retention in the 2004 general election. The questionnaires requested certain background information from the judges, such as the types of cases they had handled in the previous term of office and whether they were involved in any legal or disciplinary matters. Both Superior Court Judge Michael I. Jeffery and District Court Judge Nancy Nolan promptly returned their completed questionnaires to the council. Two of the other ten judges required to stand for retention in 2004 if they wished to retain their judgeships did not return the questionnaires and informed the council they

---

1. Alaska Const. art. IV, § 6 ("[e]ach supreme court justice and superior court judge shall, in the manner provided by law, be subject to approval or rejection"); AS 15.35.030 ("[e]ach supreme court justice shall [periodically] be subject to approval or rejection"); AS 15.35.053 ("[e]ach judge of the court of appeals shall [periodically] be subject to approval or rejection"); AS 15.35.060 ("[e]ach superior court judge shall [pe-

riodically] be subject to approval or rejection"); AS 15.35.100 ("[e]ach district judge shall [periodically] be subject to approval or rejection").

2. AS 22.10.150 (regarding superior court judges); AS 22.15.195 (regarding district court judges).

would not stand for retention. In January 2004 the council began the evaluation process for the ten judges seeking retention, including Judge Jeffery and Judge Nolan.

On June 8, 2004 the Division of Elections (the division) asked the council for the mailing addresses of the judicial retention candidates so the division could send them information about the Official Election Pamphlet. The council replied that same day by e-mailing the division the addresses for the ten judges, including Judge Jeffery and Judge Nolan. The following day, the division sent letters to the ten judges reminding them of the August 7 deadline for submitting their materials for inclusion in the voter pamphlet. The division's letter came in two versions. The version sent to Judge Jeffery and Judge Nolan began with the introductory clause "[a]lthough you have not yet filed for judicial retention," and then reminded them that "August 1 is the deadline to file for judicial retention." The other version, sent to judges who had already filed for retention, instead stated, "you have filed for retention."

In early July the council completed its evaluations of the ten judges, and on July 15 it e-mailed the division its retention and rejection recommendations for inclusion in the election pamphlet. This July 15 e-mail included the council's recommendations regarding both Judge Jeffery and Judge Nolan. Because the council found both judges to be qualified, the council members unanimously recommended that they both be retained.[3]

The statutory deadline for filing judicial declarations of candidacy for retention with the division was August 1.[4] Neither judge filed a declaration of candidacy with the division by that date.

On August 16 Judge Jeffery wrote a letter to the division requesting an extension of the filing deadline and enclosing his declaration

of candidacy form. The letter stated that "I realize these documents are late." He had executed his declaration on August 16. On August 19 Judge Nolan wrote a letter to the division enclosing her declaration of candidacy form. Her letter stated that "[t]oday it came to my attention that I failed to timely file the Declaration of Candidacy for the 2004 judicial retention election." She had executed her declaration on August 19. In response, the division informed Judge Jeffery it could not extend the deadline and informed Judge Nolan it would not place her name on the ballot.

The two judges then filed separate complaints seeking injunctive and declaratory relief. Each sought and obtained a temporary restraining order and preliminary injunction requiring the division to put their names on the 2004 ballot and to accept their submissions for the election pamphlet. In the November 2004 election both judges were retained by their respective electorates.

The judges' cases were consolidated and all parties moved for summary judgment. The superior court concluded that because both judges had substantially complied with the statutory filing requirements the division had abused its discretion in not placing their names on the ballot.

The state and the Director of the Division of Elections appeal.

## III. STANDARD OF REVIEW

 We review the superior court's grant of summary judgment de novo, drawing all factual inferences in favor of, and viewing the facts in the light most favorable to, the non-prevailing party.[5] Questions regarding the interpretation and application of a statute are questions of law to which we apply our independent judgment.[6] If the question of law involves agency expertise,

---

**3.** The scores on the Judicial Council's retention survey were consistently very high for both judges. Judge Jeffery's overall average score was 4.3 and Judge Nolan's overall average score was 4.4.

**4.** AS 15.35.070 (regarding superior court judges); AS 15.35.110 (regarding district court judges).

**5.** *Lewis v. State, Dep't of Corr.*, 139 P.3d 1266, 1268–69 (Alaska 2006).

**6.** *Catholic Bishop of N. Alaska v. Does 1–6*, 141 P.3d 719, 722 (Alaska 2006).

however, we will apply the rational basis test and defer to the agency's interpretation as long as it is supported by the facts and has a reasonable basis in law.[7] A "statutory construction adopted by those responsible for administering a statute should not be overruled in the absence of weighty reasons."[8]

■ We interpret the Alaska Constitution and the Alaska Statutes "according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters."[9]

## IV. DISCUSSION

### A. Judge Jeffery and Judge Nolan Did Not File Declarations of Candidacy by the Statutory Deadline.

Alaska Statute 15.35.070 provides: "[e]ach judge seeking retention in office shall file with the director a declaration of candidacy for retention no later than August 1 before the general election at which approval or rejection is requisite."[10] Alaska Statute 15.35.110 provides: "[e]ach district judge seeking retention in office shall file with the director a declaration of candidacy for retention no later than August 1 before the general election at which approval or rejection is requisite."[11] The "director" means the "director of elections."[12] The Division of Elections concluded that Judge Jeffery failed to comply with AS 15.35.070 and that Judge Nolan failed to comply with AS 15.35.110. The question here is whether that conclusion is correct.

The judges raise two main arguments on appeal. First, they argue that they strictly, and not just substantially, complied with the August 1 filing deadline by virtue of the June 8 and July 15 communications between the council and the division. Alternatively, they argue that we should apply the substantial compliance standard to judicial retention

election filing deadlines and hold that they substantially complied with the August 1 deadline when they filed their declaration of candidacy forms in mid-August. We address these arguments in turn.

### 1. The June 8 and July 15 communications between the council and the division were not the judges' declarations of candidacy.

■ The superior court found that both judges failed to "supply the Division with a formal statement declaring their candidacy." It nevertheless concluded that the judges met their statutory filing obligation because "[t]he documents filed with the Division in the context of the judges' performance of other mandatory acts constituted" substantial compliance with the requirements of AS 15.35.070 and .110. On appeal Judge Jeffery and Judge Nolan do not argue that the two communications the council sent to the division on June 8 and July 15 merely substantially complied with the statutory requirements; they instead argue that those communications strictly complied with the statutory requirements.

They argue that because the Election Code, Title 15 of the Alaska Statutes, does not define "declaration of candidacy," we must interpret that phrase in accordance with its commonsense meaning. They argue further that the June 8 and July 15 communications between the council and the division qualify as declarations of candidacy under this commonsense definition because the communications "clearly relayed to the Division the fact that these judges had told the Council that they personally had declared their candidacy for retention." Their argument contains two contentions. First, that the judges "unambiguously declared their candidacy" to the council by completing the council's questionnaire. Second, that in its

---

7. *W. States Fire Prot. Co. v. Municipality of Anchorage,* 146 P.3d 986, 989 (Alaska 2006) (citing *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 903 (Alaska 1987)).

8. *Storrs v. State Med. Bd.,* 664 P.2d 547, 552 (Alaska 1983) (internal quotations omitted).

9. *Native Vill. of Elim v. State,* 990 P.2d 1, 5 (Alaska 1999).

10. AS 15.35.070.

11. AS 15.35.110.

12. AS 15.60.010(3).

June 8 and July 15 e-mails, the council "unambiguously advised the Division that [Judge Jeffery and Judge Nolan] had stated their intent to stand for retention." The judges reason that the council's two communications are "declarations of candidacy" because each communication contained all the requisite information.

The Judiciary Article of the Alaska Constitution specifies that every superior court judge shall be subject to a retention vote in the first general election held more than three years after appointment and every sixth year thereafter.[13] It also states that a superior court judge's office becomes vacant ninety days after an election for which the judge fails to file a "declaration of candidacy" to succeed himself or herself.[14] The framers of the constitution left the "details of such declaration such as its form and the time limits for its filing" to the legislature.[15]

In response, the legislature established identical requirements for declarations of candidacy at every level of the judicial system: each judge must "file with the director [of the division] a declaration of candidacy for retention no later than August 1 before the general election at which approval or rejection is requisite." [16] The legislature only authorized the division to place on the ballot the names of judges who "properly filed a declaration of candidacy for retention." [17] But other than requiring judges to designate the district in which they will seek retention,[18] the statutes are silent with regard to what substance a filing must have to be considered a judge's "declaration of candidacy."

That the legislature provided little guidance to the division as to whether a given communication qualifies as a "declaration of candidacy" necessarily grants the division a certain degree of discretion in making that determination. In other words, whether a given filing satisfies the statutory requirement that each judge file with the director a declaration of candidacy is a question that involves the division's expertise.[19] We will defer to an agency's interpretation of a question of law that involves agency expertise so long as the interpretation is supported by the facts and has a reasonable basis in law.[20] Here, the division did not consider the June 8 or July 15 communications by the council to be the judges' declarations of candidacy. The judges argue and the superior court concluded that this was an abuse of the division's discretion. But because its determination was supported by the facts and had a reasonable basis in law, the division is entitled to deference for both its interpretation of the constitution and the applicable statutes and for its application of the law to the circumstances presented in this case.

13. Alaska Const. art. IV, § 6. AS 15.35.100(a) imposes the same requirement on district court judges, except that it provides that district court judges must stand for retention in the first general election held more than two years after their appointment and every fourth year thereafter.

14. Alaska Const. art. IV, § 7 ("The office of any supreme court justice or superior court judge becomes vacant ninety days after the election at which he is rejected by a majority of those voting on the question, or for which he fails to file his declaration of candidacy to succeed himself."); see also AS 22.15.170(e) (applying same consequences to district court judges who fail to file declarations of candidacy).

15. 6 Proceedings of the Alaska Constitutional Convention (PACC) App. V at 13 (December 5, 1955).

16. AS 15.35.040 (regarding supreme court justices); AS 15.35.055 (regarding court of appeals judges); AS 15.35.070 (regarding superior court judges); AS 15.35.110 (regarding district court judges).

17. See, e.g., AS 15.35.090 ("The director shall place the name of a superior court judge who has properly filed a declaration of candidacy for retention on the ballot...."); AS 15.35.130 ("The director shall place the name of a district judge who has properly filed a declaration of candidacy for retention on the ballot....").

18. AS 15.35.080 (regarding superior court judges); AS 15.35.100(b) (regarding district court judges).

19. Judge Jeffery and Judge Nolan concede that "[u]nquestionably, the Division of Elections has the authority to exercise certain discretion in administering the election statutes."

20. W. States Fire Prot. Co. v. Municipality of Anchorage, 146 P.3d 986, 989 (Alaska 2006) (citing Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co., 746 P.2d 896, 903 (Alaska 1987)).

As Judge Jeffery and Judge Nolan observe, the Election Code does not define the term "declaration of candidacy." Because these words have not "acquired a peculiar meaning, by virtue of statutory definition or judicial construction, they are to be construed in accordance with their common usage." [21] Black's Law Dictionary defines a declaration as "[a] formal statement, proclamation, or announcement, [especially] one embodied in an instrument." [22] Webster's Dictionary similarly defines a declaration as "a formal statement; proclamation." [23] Further, the Election Code refers to the declaration as something that each judge shall "file," [24] which Black's Law Dictionary defines as a verb meaning "[t]o deliver a legal document to the court clerk or record custodian for placement into the official record." [25]

The division contends that the phrase "declaration of candidacy" refers to a document that, at a minimum, must "contain a personal, affirmative declaration of the judge to be a candidate." We defer to this definition because it comports with common usage of the terms "file" and "declaration." The superior court's conclusion that both judges failed to "supply the Division with a formal statement declaring their candidacy," if correct, would therefore be fatal to the judges' argument that they filed "declarations of candidacy."

The superior court's conclusion in this regard appears to be supported by the evidence. The two documents that the judges claim qualify as their declarations are an e-mailed address list of judges sent by the council to the division on June 8 and the council's recommendations regarding the ten judges (some of whom had already filed their declarations of candidacy with the division), sent on July 15. Neither communication expressly declared that either Judge Jeffery or Judge Nolan held a present intent to stand for retention. Neither communication indicated that it was being made for the purpose of conveying any such intent or for the purpose of satisfying AS 15.35.070 and AS 15.35.110. Neither communication referred to the declaration statutes at all, and the July 15 e-mail referred instead to the "Council's contribution to the voter pamphlet," a subject governed by a different statute and a different deadline. Neither communication indicated that the council was discharging any duty imposed on either judge to communicate with the division, or that the judges had given the council permission to do so. The council's purpose for the communications was most obviously to satisfy the council's own constitutional and statutory obligations; [26] nothing implied a purpose of satisfying the candidates' own obligations to the division. And if the council had actually also intended to satisfy the declaration statutes, one would expect the council's communications to have expressly invoked the declaration statutes and mimicked the operative statutory language. The meticulous care the council took in informing these judges of their duty to file a declaration with the division by August 1 is inconsistent with reading the two communications to be those declarations.

The division's determination that the judges failed to file declarations of candidacy is a reasonable interpretation of the constitu-

---

**21.** *Div. of Elections v. Johnstone*, 669 P.2d 537, 539 (Alaska 1983) (citing *State v. Debenham Elec. Supply Co.*, 612 P.2d 1001, 1002 (Alaska 1980); *Lynch v. McCann*, 478 P.2d 835, 837 (Alaska 1970); AS 01.10.040 (providing in part: "Words and phrases shall be construed according to the rules of grammar and according to their common and approved usage.")).

**22.** Black's Law Dictionary at 436 (8th ed.2004).

**23.** Webster's New World College Dictionary at 375 (4th ed.2004).

**24.** AS 15.35.070 (regarding superior court judges); AS 15.35.110 (regarding district court judges).

**25.** Black's Law Dictionary at 660 (8th ed.2004); *Silides v. Thomas*, 559 P.2d 80, 88 (Alaska 1977).

**26.** Alaska Const. art. IV, § 9 (stating that the council must perform duties assigned by law); AS 22.10.150 (requiring the council to "conduct an evaluation of each [superior court] judge before the retention election and shall provide to the public information about the judge ... 60 days before the retention election"); AS 22.15.195 (requiring the council to "conduct an evaluation of each [district court] judge before the retention election and shall provide to the public information about the judge ... 60 days before the election").

tional and statutory requirements and is supported by the facts. It was therefore error for the superior court to conclude that the division abused its discretion in determining that the council's two communications did not qualify as the judges' declarations of candidacy.[27]

We are unpersuaded. To the extent the judges and the dissent seem to argue that the judges "declared" their candidacies by responding to the council's evaluation in November 2003, we are unpersuaded. The controlling statutes require that the declarations be filed with the division of elections, not with the judicial council.

We are also unconvinced by the dissent's contention that the council's evaluations can be considered to be declarations of candidacy and that "since the Council is obligated by law to act on and inform the Division of the judge's declaration, a judge who submits an official declaration of candidacy to the Council meets the burden of making an affirmative declaration no less effectively than by submitting it directly to the Division." [28] First, it fruitlessly confuses the inquiry, and the relevant terminology, to say that a judge submitted a "declaration" to the council. A response to the questionnaire is no "declaration" within the meaning of the controlling statutes. Nothing requires or permits a judge to submit a "declaration" of any sort to the council, much less a declaration satisfying the two declaration statutes at issue here. Moreover, because we hold in Part IV.A.2 that AS 15.35.070 and AS 15.35.110 require strict compliance, even if we assume that the council could satisfy the declaration statutes, it certainly could do so only if it indeed filed a "declaration" satisfying the division, and presumably only after the judges gave it authority to do so. The council, by performing its own specified duties, has no implicit or explicit incidental authority or responsibility to convey declarations of candidacy to the division. And, as we will see in the next part of our discussion, there is no evidence in this case contempora-

neous with the filing deadline that suggests the candidates had given the council authority to declare their candidacies, or that they thought the council's communications with the division had relieved them of their duty to file declarations of candidacy with the division.

## 2. Strict compliance with the filing deadline is required.

The judges also argue that, even if we hold that the June 8 and July 15 communications did not satisfy the statutory requirements, we should affirm the superior court on the alternative ground that judicial retention candidates need only substantially comply with election filing deadlines. The judges argue that strict compliance is only appropriate with regard to non-judicial candidates because they have to supply much more information than their judicial counterparts, presumably because information about judges is already available in the public records. They also point out that strict compliance is justified in the political arena because it prevents potential "gamesmanship," by which a candidate could otherwise wait until the last minute to decide to run after first seeing who else filed. This concern does not carry over to judicial retention elections because judicial candidates are unopposed.

The judges substantially complied with the August 1 deadline, they argue, when they filed their declaration of candidacy forms with the division in mid-August. The judges argue that those filings substantially complied with the deadline because the division "was not hampered in its preparations for the election" since the council had previously provided the necessary information. Further, they contend that although their mid-August filings were after the deadline, they were filed "comfortably before the Division's deadlines for printing ballots and election pamphlets."

"[W]here the election statutes fix a date for filing petitions or certificates of

---

27. Because we hold that the division did not abuse its discretion in determining that the judges failed to file declarations of candidacy, we do not need to decide whether the council could

file a declaration of candidacy with the division on a judge's behalf.

28. Dissent at 245.

candidacy, such documents must be filed before the expiration of the time fixed, and [the] election officials may not exercise any discretion in the matter." [29] In *Falke v. State* we stated that it is "well established, both in Alaska and in other jurisdictions, that election law filing deadlines are to be strictly enforced. Strict compliance is the rule, and substantial compliance the rare exception." [30] Because filing dates are mandatory, "substantial compliance is not sufficient, absent substantial confusion or 'impossibility.' " [31]

Thus far we have permitted substantial compliance with an election filing deadline in only one case. In *Silides v. Thomas,* the candidate did not strictly comply with the deadline for filing his financial disclosure statement. [32] We held that the election statutes that required Silides to simultaneously file his financial disclosure statement in Anchorage and his declaration of candidacy in Juneau were inherently unclear and impossible to comply with. [33] Because of the "lack of clarity inherent in" the statute and "the impossibility of compliance," we departed from the "normally salutary doctrine that election deadlines must be strictly construed and strictly enforced" and held that substantial compliance was sufficient. [34] In *Division of Elections v. Johnstone,* we did not rely on a substantial compliance theory, but we allowed Judge Johnstone to remain on the bench even though he failed to file his declaration of candidacy by the deadline. [35] We excused Judge Johnstone's failure to timely file his declaration of candidacy because we concluded that the Alaska Constitution was ambiguous with regard to when he was required to stand for retention. [36] Judge Johnstone was not given any special treatment, however, because of his status as a judge. He was effectively given the same treatment as Silides, a non-judge.

In both *Silides* and *Johnstone,* we did not require strict compliance. But in both cases we held that statutory or constitutional ambiguity, and not a candidate's oversight, justified departure from the strict compliance standard. [37] Because the August 1 declaration deadlines cannot reasonably be considered ambiguous or impossible to comply with, there is no justification for departing from the strict compliance standard here.

The dissent may reason that the statutory retention process was confusing or that the statutes were somehow ambiguous. [38] There is no ambiguity in the clear language of AS 15.35.070 or AS 15.35.110 or in any of the procedures. There is no basis for importing a substantial compliance factor into their text.

As confirmation of that proposition, it is clear that no one was confused in June or July, or before August 19, 2004, or had any doubt about what the declaration statutes required. On June 9 the division sent the two judges letters stating "you have not yet filed for judicial retention. . . . August 1 is the deadline to file for judicial retention." In comparison, the division sent different letters to those judges who had filed a declaration; those letters stated "you have filed for retention." On July 15, the same day the council sent its July 15 e-mail to the division, the council also sent a memo to the ten judges, explaining both the duty to file a timely declaration and the consequences of failing to file on time:

---

**29.** *Falke v. State,* 717 P.2d 369, 374 (Alaska 1986) (quoting *Andrews v. Sec'y of State,* 235 Md. 106, 200 A.2d 650, 651 (1964) (citation omitted)); *see also Silides v. Thomas,* 559 P.2d 80, 87 (Alaska 1977).

**30.** *Falke v. State,* 717 P.2d 369, 373 (Alaska 1986) (citations omitted).

**31.** *State v. Marshall,* 633 P.2d 227, 235 (Alaska 1981) (holding that declaration of candidacy filed ten minutes late was not "timely") (citing *Silides,* 559 P.2d at 86); *see also Falke,* 717 P.2d at 373 (substantial compliance standard improper unless statute ambiguous).

**32.** *Silides v. Thomas,* 559 P.2d 80, 82 (Alaska 1977).

**33.** *Id.* at 86.

**34.** *Id.*

**35.** *Div. of Elections v. Johnstone,* 669 P.2d 537, 542–45 (Alaska 1983).

**36.** *Id.* at 544.

**37.** *Id.; Silides,* 559 P.2d at 86.

**38.** Dissent at 243, 245.

In order to continue as a judge past next January, state statutes require you to file with the Director [of Elections] a declaration of candidacy ... no later than August 1.... If you do not file this declaration of candidacy with the Director of Elections on or before August 1, your name will not appear on the ballot this fall and your term as judge will end ninety days after the election.

This message unambiguously conveyed the clear statutory requirements and consequences. Given this message from the council to the judges, neither the council nor the judges could have thought any communication between the council and the division could satisfy the declaration statutes. And on August 16, 2004, when Judge Jeffery submitted his declaration of candidacy to the division, he stated in his accompanying letter "I realize these documents are late." On August 19, 2004, when Judge Nolan submitted her declaration of candidacy, she stated in her letter "[t]oday it came to my attention that I failed to timely file the Declaration of Candidacy." These communications are inconsistent with any notion that the statutes or the procedures were ambiguous or confus-

ing or that the council or reasonable persons could have thought that communication by the council with the division would relieve or had relieved the judges of their statutory duty to file declarations of candidacy with the division.

Furthermore, the declaration statutes effectively require a candidate to communicate to the division the candidate's current intention to stand for retention. The August 1 deadline chosen by the legislature is late enough in the election sequence that it provides an accurate declaration of each candidate's current intentions, unlike anything that might be inferred from whatever the judge may have told the council the prior November, before the evaluation process began.[39] Likewise, the August 1 declaration deadline allows jurists previously interested in retention to silently drop out before publication of any adverse evaluation by the council or adverse information from the Judicial Conduct Commission.[40] This might explain why the legislature adopted the August 1 deadline for declaring candidacy for retention[41] and the August 7 deadline for submitting information for inclusion in the election pamphlet.[42]

**39.** The dissent contends that it is incorrect to assume "that the goal of a declaration requirement is to elicit a 'final decision,' rather than just a clear declaration of present intent." Dissent at 247.

This contention is problematic. Whether or not a declaration is to be a "final decision," the statutes implicitly require a current decision, a present-day expression contemporaneous with the date it is filed. They seem inconsistent with conveying a stale decision, such as reflected in any information in the questionnaire responses sent to the council nearly eight months before. The dissent's contention may also assume that the council's communications with the division somehow amounted to a "clear declaration of present intent." But the July 15 communication is not a "declaration" at all. Nor is it a "clear" declaration, or a declaration of "present intent." This contention also seems to depend on the council's discharge of its obligations in conducting and forwarding the evaluation results. The council's executive director explained in an affidavit filed in the superior court that "[i]t would only be upon an affirmative statement by the judge that he or she did not intend to stand for retention that the judicial council would refrain from evaluating a judge who was required to stand for retention." Thus, the council would treat both a judge who altogether failed to re-

spond to the November questionnaire and a judge who responded the same: It would evaluate both judges and forward the evaluation results for both to the division for inclusion in the election pamphlet. Therefore the council itself does not treat questionnaire responses as a declaration critical to triggering or discharging the council's duties.

**40.** AS 22.30.011(h) (providing in relevant part that after a "judge has filed a declaration for candidacy for retention in office, the [Judicial Conduct Commission] shall report ... each public reprimand, suspension, or public censure received by the judge").

In selecting the August 7 deadline it seems improbable that the legislature intended that by supplying the evaluation and conduct information for the election pamphlet by August 7, the council would have any role in satisfying the August 1 declaration obligation the legislature imposed on the candidates.

**41.** AS 15.35.070 (requiring declaration by superior court judge by August 1); AS 15.35.110 (requiring declaration by district judge by August 1).

**42.** AS 15.58.050 (providing in relevant part that "[n]o later that August 7 ... the judicial council

A substantial compliance standard is thus inconsistent with both the text of the controlling declaration statutes and with the way the division, the council, and even the judges interpreted the declaration statutes on or before August 19, 2004.[43]

## B. The Judges Must Vacate Their Seats Within Ninety Days.

▮▮▮▮ Having determined that the judges failed to file declarations of candidacy by the statutory deadline, we now consider the appropriate remedy. The superior court concluded that the forfeiture sanction would be inappropriate. It reasoned that because it had found that the judges' "filing snafus" would not impact the election process, the hardship that vacation would cause on both the judges personally as well as the "constitutional retention election system and the electorate" would be too severe.

On appeal Judge Jeffery and Judge Nolan argue that, under *Johnstone*,[44] we should weigh the hardship of our remedy on the judges and on the electorate against the hardship caused to the public from the judges' failure to timely file their declarations of candidacy. They note the personal hardship that would be imposed on them if they were required to forfeit their offices. More importantly, they argue, the public was unharmed by their actions because it had ample time to consider whether to support or oppose their candidacies. They observe that the council: (a) treated the judges as candidates when it conducted surveys in early

2004, (b) held a public hearing on the judges in May 2004, (c) issued a press release announcing that it supported the judges' retention on July 26, and (d) listed the judges as candidates on its website "many months before the election."

The constitution states in part that a superior court judge's office "becomes vacant ninety days after the election ... for which he fails to file his declaration of candidacy to succeed himself."[45] The legislature mirrored this wording when it enacted the two statutes that regulate when a superior court or district court judge's office becomes vacant.[46] We interpret the Alaska Statutes "according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters."[47] The plain meaning of the constitution and the statutes is that vacation is the mandatory consequence for a judge's failure to file a declaration of candidacy.

*Johnstone* can be differentiated from this case. In *Johnstone* we held that we were establishing a new principle of civil law.[48] We therefore analyzed the hardship to Judge Johnstone and the electorate to determine whether our holding should only apply prospectively.[49] If our holding had not established a new principle of law, however, in the sense that it had not "overrule[d] prior law or decide[d] an issue of first impression," the threshold test for prospective application would not have been met[50] and our analysis

---

shall file ... a statement including ... the evaluation of each justice or judge conducted by the judicial council ... [and a] statement describing each public reprimand, public censure, or suspension").

43. It is therefore unnecessary to consider whether the judges substantially complied with the declaration statutes. We nonetheless are unconvinced by any assertion that the judges substantially complied when the council conveyed the evaluation and conduct information on July 15. Not only must the division receive the critical information—a straightforward expression of the candidate's intent, held at the moment of filing, to stand for retention—but the requirement of a "declaration" implies some degree of formality beyond a message to be inferred from the council's submissions for inclusion in the election pamphlet.

44. *Div. of Elections v. Johnstone*, 669 P.2d 537, 545–45 (Alaska 1983).

45. Alaska Const. art. IV, § 7.

46. AS 22.10.100(b) (regarding superior court judges); AS 22.15.170(e) (regarding district court judges).

47. *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999).

48. 669 P.2d at 544.

49. *Id.* at 545–46.

50. *Commercial Fisheries Entry Comm'n v. Byayuk*, 684 P.2d 114, 117–18 (Alaska 1984) ("[W]hether the holding overrules prior law or

of the hardship of our holding would not have been triggered.

█ Here, the law is clear that, absent statutory ambiguity, strict compliance with election filing deadlines is required,[51] and the penalty for noncompliance is mandatory vacation of office.[52] We have no doubt that requiring Judge Jeffery and Judge Nolan to vacate their office will lead to personal hardship. This must seem like a bitter reward for years of extraordinary public service by both judges. But because we are not establishing a new principle of law by holding that the judges' failure to meet the filing deadline triggered the mandatory vacation sanction, our decision is constrained by the controlling legal principles. It was error to rule that the hardship to the judges and electorate precluded application of the forfeiture sanction.[53]

## V. CONCLUSION

Because the division's determination that Judge Jeffery and Judge Nolan failed to file declarations of candidacy by the August 1 deadline was supported by the facts and had a reasonable basis in law, we REVERSE the superior court's judgment and ORDER the appellees to vacate their seats within ninety

days after this opinion takes effect per Alaska Appellate Rule 507(b).[54]

FABE, Chief Justice, not participating.

BRYNER, Justice, dissenting.

## I. INTRODUCTION

Alaska law requires judges who seek retention to declare their candidacy to the Alaska Division of Elections no later than August 1 of the election year. Here, two judges who sought retention and received favorable evaluations by the Alaska Judicial Council failed to file personal declarations of candidacy with the Division; for that reason, the Division refused to include them on the ballot, despite its receipt of timely filings of the Council's evaluations, which established that the judges had already declared to the Council their intent to stand on the ballot. Today's opinion upholds the Division's decision. I disagree.

As an integral part of the judicial retention process established by Alaska law, the Council must contact and evaluate all sitting judges who seek retention well in advance of the deadline for filing their declarations of candidacy with the Division. As part of its evaluation process, the Council must identify

decides an issue of first impression[ ] serves as a threshold test to determine whether a purely prospective application of a new rule of law is even at issue.").

51. *See, e.g., Falke v. State,* 717 P.2d 369, 373 (Alaska 1986); *Silides v. Thomas,* 559 P.2d 80, 86 (Alaska 1977).

52. *See* Alaska Const. art. IV, § 7 (regarding superior court judges); AS 22.10.100(b) (regarding superior court judges); AS 22.15.170(e) (regarding district court judges).

53. We note that although Judge Jeffery and Judge Nolan failed to timely file declarations of candidacy, the judgments they have issued or will issue in the interim period between when they were supposed to vacate their office (ninety days after the November 2004 election) and when they are now ordered to vacate (ninety days after this opinion takes effect per Appellate Rule 507(b)) are protected from collateral attack under the de facto judge doctrine. *See Gates v. City of Tenakee Springs,* 954 P.2d 1035, 1038–39 (Alaska 1998).

54. Alaska Appellate Rule 507 provides:

(a) The opinion of the appellate court, or its order under Rule 214, shall constitute its judgment, and shall contain its directions to the trial court, if any. No mandate shall be issued.
(b) Unless the opinion or order expressly states otherwise, the judgment of the appellate court takes effect and full jurisdiction over the case returns to the trial court on the day specified in Rule 512(a) for return of the record. However, in an appeal under Appellate Rule 207 relating to release prior to judgment, the judgment of the Court of Appeals takes immediate effect and full jurisdiction over the case returns to the trial court on the day the Court of Appeals issues its opinion or order deciding the appeal.
(c) A motion to stay the effect of the judgment of the appellate court beyond the day specified in Rule 512(a) shall be made to that court.
Alaska Appellate Rule 512(a) provides in pertinent part:
(3) In a case decided by the supreme court, the record shall be returned:
[a] on the day after the time for filing a petition for rehearing expires, if no timely petition for rehearing is filed; or
[b] on the day after the supreme court disposes of the case on rehearing, if a timely petition for rehearing is filed.

which judges actually intend to stand on the retention ballot, and, after evaluating those who declare their intent, it must file its evaluations with the Division so that the evaluations can appear in the Division's Election Pamphlet.

Because the law authorizes the Council to determine which judges declared their intent to run, requires it to base its evaluations on this determination, and obliges it to file its evaluations with the Division, the Council's compliance with these obligations before the August 1 deadline met all statutory requirements for timely declarations of candidacy. The Council's evaluations formally establish that each judge who is favorably evaluated has declared the intent to stand for retention and possesses the qualifications to do so. The evaluations also incorporate all other information required by the Division's prescribed form for declaring candidacy. Accordingly, I would conclude that the Division had authority to accept the evaluations as declarations of candidacy, even though they were filed by the Council and not by the individual judges evaluated.

## II. OVERVIEW OF ALASKA'S JUDICIAL RETENTION PROCESS

To explain my conclusion, it will help to begin by reviewing Alaska's judicial retention process. Under Alaska law, judges are appointed to office for indefinite terms but must periodically appear on the ballot to allow voters to determine whether they should be retained.[1] Each judge must initially stand for retention in the first general election held more than three years after the judge's appointment.[2] After the initial retention election, the interval to the next election depends on the level of judgeship: ten years for supreme court justices;[3] eight years for court of appeals judges;[4] six years for superior court judges;[5] and four years for district court judges.[6]

The procedures for conducting judicial retention elections are unique to Alaska. Alaska law requires three separate state agencies to participate in the process: the Alaska Judicial Council,[7] the Alaska Commission on Judicial Conduct,[8] and the Alaska Division of Elections.[9] The role played by each agency will be outlined below; because the court's opinion focuses on the Division's role in the process and makes only passing reference to the Council's actions, the description here will focus more closely on the Council's part of the overall process.

### A. The Council's Role in the Retention Process

Alaska's judicial retention process begins with the Alaska Judicial Council. The Council is an independent state agency created by the Alaska Constitution whose primary constitutional charge is to solicit, evaluate, and nominate to the governor applicants for judicial positions.[10] But the constitution also requires the Council to perform other functions upon direction by the legislature.[11] The key duties the legislature assigned to the Council include conducting a preelection evaluation of each justice or judge seeking retention, informing the public about its evaluation, and filing the evaluation with the Director of Elections for inclusion in the Divi-

1. *See* Alaska Const. art. IV, §§ 5, 6; AS 15.15.030(10); AS 22.10.150; AS 22.15.195.

2. Alaska Const. art. IV, § 6.

3. Alaska Const. art. IV, § 6; AS 15.35.030; AS 22.05.100.

4. AS 15.35.053; AS 22.07.060.

5. Alaska Const. art. IV, § 6; AS 15.35.060; AS 22.10.150.

6. AS 15.35.100; AS 22.15.195.

7. *See* AS 22.10.150; AS 22.15.195.

8. AS 22.30.010.

9. *See* AS 15.10.105(a). Alaska law dealing with the requirements of the retention process variously attaches responsibilities to the Division of Elections, the director of the Division, and the lieutenant governor. As a practical matter, these distinctions are inconsequential, since the Division falls under the supervision of the lieutenant governor and the director heads the Division. Unless context requires otherwise, this dissent will simply refer to "the Division." *See id.*

10. *See* Alaska Const. art. IV, § 9.

11. *See id.*

sion's Election Pamphlet.[12] To this end, the Election Code specifically directs the Council to evaluate "each supreme court justice, court of appeals judge, superior court judge, and district court judge who will be subject to a retention election" and to file with the lieutenant governor by August 7 a statement incorporating the Council's evaluation of each candidate.[13]

In keeping with this statutory duty, the Council has developed and adopted an intensive public process to evaluate the performance of judges who intend to stand for retention.[14] This process encompasses all aspects of the judge's performance; it collects, compiles, and analyzes data from a broad spectrum of participants in the judicial process; it invites all interested members of the public to participate and comment on the candidates at various stages of the process; and the Council's activities are publicized on an ongoing basis by notice of the Council's hearings, statewide press releases, and a regularly updated, widely advertised website.[15]

Because this process is time consuming, the Council must begin its evaluation in the fall of the year preceding the year in which the retention election is to be held-almost a year before the election and nine months before the Council's August 7 deadline for filing its evaluations with the Division. Since the Council's statutory charge is to evaluate those judges who "will be subject to" the election [16]—not all judges eligible to run—the Council begins by sending all judges eligible for retention a memo specifically addressed to "Judges Standing for Retention"; the memo attaches a questionnaire soliciting information from those judges who consider themselves to be "Candidates for Judicial Retention." The questionnaire asks responding judges for various categories of information relevant to their retention:

- a statistical breakdown of their workload;

- a summary of their participation on court/bar committees and in other administrative activities;

- a narrative statement assessing their judicial performance, including satisfaction with their judicial role, contributions to the judiciary or the field of law, and improvements in knowledge and skills;

- a description of non-judicial events and activities that could conflict with their judicial responsibilities, such as having tax liens or collection proceedings filed against them, being involved in non-court-related legal proceedings, engaging in the practice of law, or holding any

12. Alaska Statute 22.05.100 provides:

 Each supreme court justice is subject to approval or rejection as provided in AS 15 (Alaska Election Code). The judicial council shall conduct an evaluation of each justice before the retention election and shall provide to the public information about that justice and may provide a recommendation regarding retention or rejection. The information and any recommendation shall be made public at least 60 days before the retention election. The judicial council shall also provide the information and any recommendation to the office of the lieutenant governor in time for publication in the election pamphlet under AS 15.58.050. If a majority of those voting on the question rejects the candidacy, the rejected justice may not be appointed to fill any vacancy in the supreme court, court of appeals, superior court, or district courts of the state for a period of four years thereafter.

Alaska Statutes 22.07.060, 22.10.150, and 22.15.195 establish identical requirements with respect to judges of the court of appeals, the superior court, and the district court.

13. Alaska Statute 15.58.050 states:

 No later than August 7 of the year in which the state general election will be held, the judicial council shall file with the lieutenant governor a statement including information about each supreme court justice, court of appeals judge, superior court judge, and district court judge who will be subject to a retention election. The statement shall reflect the evaluation of each justice or judge conducted by the judicial council according to law and shall contain a brief statement describing each public reprimand, public censure, or suspension received by the judge under AS 22.30.011(d) during the period covered in the evaluation. A statement may not exceed 600 words.

14. *See* Alaska Judicial Council, *Alaska Judicial Council Retention Evaluation Program, in* ALASKA JUDICIAL COUNCIL, TWENTY-THIRD REPORT: 2005–2006 TO THE LEGISLATURE AND SUPREME COURT app. F (2007), *available at* http://www.ajc.state.ak.us/reports/23 rdReport.pdf.

15. *See id.*

16. AS 15.58.050.

other local, state, federal, or political office;

- lists describing case names, numbers, and participants in the three most recent cases handled by the judge involving jury trials, non-jury trials, and dispositions requiring significant work but ending without a trial; and

- a list of case names, case numbers, and participants for any other particularly noteworthy cases.

Judges who do not intend to run for retention are not expected to return the questionnaires and, in fact, do not return them. Those who do want to stand for retention return the questionnaires; by so doing they provide the Council with the information and authorization needed to trigger its statutorily mandated evaluation. In effect, then, judges who submit completed questionnaires to the Council declare their intent to stand on the ballot.[17] For its part, the Council interprets its statutory duty as obliging it to "evaluate each judge standing for retention elections"; in keeping with this interpretation, it treats the returned questionnaires as declarations of candidacy. The Council does not evaluate eligible judges who decline to return questionnaires, and throughout the course of its evaluation process it consistently refers to the responding judges as judges who will actually "stand[ ] for retention."

After receiving questionnaires from judges who intend to stand for retention, the Council undertakes its investigation and prepares its evaluation. The Council's investigation relies on three broad sources of information: surveys asking various interested groups to evaluate the judge's performance; collection and review of all performance-related materials available concerning the judge, including materials available from other public agencies such as the court system, the Alaska

Public Offices Commission, and the Commission on Judicial Conduct; and information obtained through public input actively solicited by the Council. In summarizing its evaluation procedures for the 2004 retention election, the Council emphasized the breadth and openness of the process:

> The Judicial Council evaluates judges with the help of thousands of Alaska citizens—police and probation officers, attorneys, jurors, court employees, social workers and others who appear in court before the judges. In 2004, the Council surveyed these groups, asked for written and oral comments from the public throughout the state, and reviewed records about judges' workloads, conflicts of interest, and other aspects of performance.

Upon completing its investigation and compiling all relevant data, the Council's staff prepares the judicial evaluations and circulates the compiled materials to Council members for review. The Council meets in July to consider the information and make retention recommendations.[18] As required by law, the evaluations are then filed with the lieutenant governor for inclusion in the Division's Election Pamphlet. For the 2004 retention election, the Council held its meeting to adopt the evaluations and recommendations on July 12, 2004. On July 15, the Council filed all the judicial evaluations and recommendations, as well as a two-page description of the Council's judicial evaluation process, by transmitting these materials to the Division in the form of Microsoft Word e-mail attachments. In addition, the Council sent a CD and hard copies of the same information as a backup in the event the Division encountered problems with the documents in their e-mailed format. These filings conformed to the Division's regulations, which allow elec-

17. Indeed, by returning the questionnaires, not only do the responding judges literally declare themselves to be "Candidates for Judicial Retention," but they sometimes respond to specific questions with statements that clearly confirm their active intent to continue serving as judges. For example, in response to the questionnaire's request to comment on her judicial performance during her current term, Judge Nolan outlined areas of her current accomplishments and went

on to emphasize: "I expect to continue and expand these efforts in the future. I hope to address reform to the current District Court calendaring system to better serve the public and promote judicial well-being."

18. Alaska Judicial Council, Retention Evaluation Information, http://www.ajc.state.ak.us/ Retention/retent.htm (last visited Oct. 26, 2007).

tronic filing.[19]

The Council's two-page description of its evaluation process identified the judges covered in its evaluation as judges who were standing for the retention election, stating in relevant part:

[S]tate laws require that the Judicial Council evaluate each judge standing for retention elections. Other laws require that the Judicial Council publish its evaluation in the Voters' Pamphlet. The evaluations of judges standing in the November 2004 election appear on the following pages.

The individual evaluations for Judges Nolan and Jeffery disclosed the judicial districts in which they were running and summarized the information the Council had evaluated. Specifically, Judges Nolan's and Jeffery's evaluations revealed that the Council had surveyed and received ratings from 2,927 attorneys; 1,495 peace and probation officers; jurors appearing before the judges in 2002 and 2003; court employees; and an independent, community-based, volunteer court-observer organization. In addition, the judges' evaluations noted that the Council had

completed a background investigation including a court records check, a disciplinary records check, a review of conflict of interest statements submitted to the court system and a review of financial disclosure statements submitted to the Alaska Public Offices Commission. Attorneys, peace officers, court employees and jurors were asked to submit written comments about the judges. The Council actively encouraged the public to comment, both in writing and in a statewide public hearing teleconference.

19. *See, e.g.,* 6 AAC 25.700(b).

20. *See* Alaska Const. art. IV, § 10.

21. *See id.*

22. *See id.*

23. Alaska Statute 22.30.011(h) states:
 If a judge has been publicly reprimanded, suspended, or publicly censured under this

Based on the totality of this information, the Council recommended that the public vote to retain both judges.

On July 26, 2004, the Council issued a statewide press release announcing that, "after a comprehensive evaluation of judicial performance," it had "found all ten judges standing for retention in the 2004 general election [to be] qualified." The Council also recommended that voters retain each judge. The press release set out a detailed description of the Council's retention process, explained that "Alaska law requires the Judicial Council to evaluate every judge standing for retention and to make the evaluations public." The press release also included a 2004 Judicial Evaluation Summary disclosing various survey ratings received by each judge assessing their performance in office.

## B. The Commission's Role in the Process

Under Alaska law, the Alaska Commission on Judicial Conduct also plays a role in the judicial retention process, albeit a considerably more limited role than the one played by the Council. Like the Council, the Commission is an independent state agency established under the Alaska Constitution.[20] The Commission's primary constitutional duty is to investigate complaints of judicial misconduct and to recommend the imposition of appropriate sanctions by the Alaska Supreme Court.[21] The Alaska Constitution gives the legislature authority to establish the Commission's specific powers and duties.[22]

One such duty, set out in AS 22.30.011(h), requires that, when a judge files a declaration of candidacy to stand for retention, the Commission must give the Council a report disclosing any public discipline imposed against that judge, so that the discipline will be included with the Council's evaluation in the Election Pamphlet.[23] As evidenced by

section and the judge has filed a declaration of candidacy for retention in office, the commission shall report to the judicial council for inclusion in the statement filed by the judicial council under AS 15.58.050 each public reprimand, suspension, or public censure received by the judge
 (1) since appointment; or

the Council's 2004 evaluations, the Commission reports the required information to the Council during the course of the Council's retention investigation, well in advance of the August 1 deadline for judges to file declarations with the Division.[24] Thus, in performing its statutory duty to report any public discipline imposed on a judge who "has filed a declaration of candidacy for retention in office," the Commission, like the Council, considers any judge under active review by the Council to be a judge who has filed a declaration.

### C. The Division's Role in the Process

Under Alaska law, the director of the Division of Elections has a duty to provide general administrative supervision over state elections.[25] This general duty encompasses the duty to supervise judicial retention elections. Each judge seeking retention must pay a filing fee and file a declaration of candidacy with the Division by August 1 of the year in which the election will be held.[26] Apart from requiring judges to designate the judicial district in which retention is sought, the Election Code does not prescribe any particular form for the declaration or specify what information it must contain.[27] The Division has adopted a declaration form for retention elections that requires judges to provide contact information and to have their signatures notarized. As recognized in today's opinion, the Division does not demand strict adherence to this declaration form; but it does require, at a minimum, that the declaration "contain a personal, affirmative declaration of the judge to be a candidate."[28] Once a declaration is properly filed, the Division must place the judge's name on the retention ballot;[29] the Division must also include the judge in the Election Pamphlet, along with the Council's evaluation and recommendation on retention.[30]

## III. ANALYSIS

### A. The Council's Evaluations Amounted to Timely and Statutorily Authorized Filings of Declarations of Candidacy Made by the Judges.

Here, applying its own interpretation of what a minimally acceptable declaration must contain, the Division contends that the Council's retention evaluations—filed with the Division by e-mail on July 15, 2004—were not minimally acceptable as declarations of candidacy. Though acknowledging that "the legislature provided little guidance ... as to whether a given communication qualifies as a 'declaration of candidacy,'" today's opinion reasons that this ambiguity gave the Division "a certain degree of discretion" in deciding what to accept as a proper disclosure.[31] Deferring to the Division's expertise, today's opinion accepts its interpretation, finding that it is supported by the facts and has a reasonable basis in law.[32]

But the opinion and the state both mistakenly treat the judicial retention process as essentially a one-agency ship with the Division alone at the helm. As shown in the description above, the process in fact requires the participation and cooperation of three separate state agencies; and the legislature has assigned the initial, and in many respects the primary, responsibility for steering the course of the process to the Council, not the Division. While the law undeniably requires judges seeking retention to declare

(2) if the judge has been retained by election, since the last retention election of the judge.

24. The timing of the Commission's report is evident because, when filed with the Division on July 15, 2004, the Council's evaluations expressly declared that the Council had already completed "a disciplinary records check" for both Judge Nolan and Judge Jeffery.

25. *See* AS 15.35.070.

26. *See, e.g.,* AS 15.35.070; AS 15.35.071; AS 15.35.110; AS 15.35.120.

27. *See, e.g.,* AS 15.35.080; AS 15.35.130.

28. Majority at 232 (quoting the state's reply brief at 8).

29. *See, e.g.,* AS 15.35.090; AS 15.35.130.

30. AS 15.58.050.

31. Majority at 231.

32. Majority at 231.

their candidacy to the Division, it independently empowers the Council to determine for itself which judges have declared their intent to run for retention. When the Council determines that a judge does intend to run, the law further requires it to investigate and evaluate the judge and to file its evaluation and recommendation with the Division.

When viewed as a whole, it seems apparent that this legislatively mandated process gives both the Council and the Division independent authority to elicit, receive, and act on declarations of candidacy from eligible judges who are seeking retention. Yet nowhere does the law empower either agency to restrict, ignore, or override a determination formally made by the other in performing its part of the process.

As noted above, when the Council sends a retention questionnaire to a judge eligible for retention, the questionnaire is expressly directed to "Judges Standing for Retention" and "Candidates for Judicial Retention." A judge who completes and returns the questionnaire thus unequivocally declares the intent to stand for retention; and in so doing, the judge provides the Council with the information it needs to investigate and evaluate the judge's performance. The completed questionnaire thus enables and authorizes the Council to undertake its investigation— which the Council would otherwise have no authority to conduct.

By returning the retention questionnaire, then, the judge initiates a formal administrative process that treats the judge as a declared candidate; announces the judge to be running for retention; investigates the judge's qualifications and performance; and ultimately leads to the filing of a statutorily mandated report with the Division that evaluates the judge as a candidate standing for retention and recommends how the public should vote. Furthermore, the evaluation communicates to the Division all the information the Division requires to be included in a declaration of candidacy for judicial retention.

It follows that, when the Council files its evaluation with the Division on or before the August 1 deadline for declaring candidacy, the filing actually complies with all statutory prerequisites for a timely and properly filed declaration · of candidacy. Just as a final judgment issued by a court stands as evidence that the underlying facts and law necessary to support the judgment have been determined and are no longer in question, so the Council's evaluation, upon being filed with the Division, establishes the Council's formal determination that the evaluated judge has in fact declared the intent to stand on the ballot and qualifies as a candidate for retention. The Division has no more authority to disregard or reinterpret the Council's formal determination that a judge is standing for retention than it does to disregard or reinterpret the Council's evaluation of the judge's performance.

**B. The Council's Evaluations Substantially Complied with the Division's Own Prescribed Declaration Form.**

This is not to say that the Division, in performing its own assigned duties in the overall retention process, lacks authority to require something else from the judge by way of a declaration. Here, by promulgating its own declaration of candidacy form for judges seeking retention, the Division chose to require a specific form of declaration that differs from the declaration embedded in the judicial evaluation reports filed by the Council. As the court correctly observes in today's opinion, because "the statutes are silent with regard to what substance a filing must have to be considered a judge's 'declaration of candidacy,'" [33] the Division has authority to adopt its own declaration form and to require judges seeking retention to comply with it—just as the Council has authority to decide what a judge should be required to submit in order to declare candidacy to the Council for purposes of initiating its retention evaluation process. But as the court also acknowledges, the Division has broad discretion to accept declarations that are timely filed but fail to conform exactly to the Division's declaration form. [34]

---

**33.** Majority at 231.

**34.** *See* Majority at 231.

Moreover, although the Division unquestionably had authority to promulgate and enforce its own declaration requirement, its prescribed disclosure form is not the exclusive form authorized by the legislature. As already indicated, in fulfilling its duty to evaluate judges seeking retention, the Council had independent statutory authority to ask judges to declare their candidacy to the Council; and within its sphere of operation, the Council, not the Division, had the authority to determine what constituted a valid declaration of candidacy. Viewing the retention process as a whole, it seems fair to conclude that both the Division's form of declaration and the form recognized by the Council met the broad and largely undefined statutory requirement for a declaration. Accordingly, on July 15, 2004, when the Council filed retention evaluations with the Division that reflected the Council's official determination that all judges evaluated were declared candidates for retention, its filing communicated to the Division a timely and statutorily compliant declaration of candidacy by the judges.

Because the Council filed its evaluations before the Division's deadline for candidate declarations and because the evaluations complied with the statutory requirement for a declaration, the proper standard for determining whether the evaluations passed muster under the Division's prescribed disclosure form should be whether they substantially complied with the Division's prescribed form, not whether they strictly complied. Given the bifurcated allocation of institutional responsibilities that defines Alaska's judicial retention process, the Election Code's provisions requiring a judge's declaration of candidacy to be filed in the form of a declaration to the Division—rather than as a declaration originally made to the Council and later forwarded to the Division as part of the Council's required filing—amounts to a requirement of form rather than substance. And in the arena of election filings, we have consistently recognized that, so long as a filing is timely and complies with all substantive requirements imposed by law, any technical or formal deficiencies in the filing are insubstantial and may be corrected after filing.[35]

Here, the information included in the Council's evaluations covered all of the substantive information required by the Division's declaration form. In my view, it follows that the Division had authority to accept the July 15 filings as timely and properly filed declarations of candidacy, subject to correction to ensure compliance with the Division's own formal and technical standards.[36]

### C. The State's Arguments Fail To Support Its Position that the Council's Evaluations Could Not Be Considered To Be Declarations of Candidacy.

The state vigorously argues that the judges' failure to file personal declarations with the Division caused substantial institutional harm in light of the intended purposes of requiring judges to declare their candidacy to the Division. The state points out that the Alaska Constitution's retention requirement implicitly demands that judges formally declare their candidacy; the state further points out that the Alaska Statutes specifically require judges to submit their declarations to the Division. According to the state, accepting the Council's evaluations as a substitute for a direct declaration by the judges to the Division would frustrate many of the purposes served by these declaration requirements. But the state's position turns on the mistaken premise that the Division plays the only significant role in the judicial retention process and that the Division's view of the law controls the entire process. When the judicial retention process is realistically viewed in totality, as we must properly view it, none of the specific points advanced by the state stands up to scrutiny.

---

**35.** See, e.g., *Grimm v. Wagoner*, 77 P.3d 423, 429–31 (Alaska 2003).

**36.** If deemed equivalent to a declaration of candidacy, the Council's evaluations also would have failed to comply with the separate statutory provision requiring a filing fee to be paid for a declaration. See, e.g., AS 15.35.071; AS 15.35.120. The state has not claimed that it lacks authority to relax the filing fee deadline when an otherwise timely and proper declaration of candidacy is submitted without the proper fee.

### 1. Construing the Council's evaluations to be properly filed declarations of candidacy does not violate the purposes of the statutory declaration requirement.

As already described at considerable length, although Alaska requires judges to file declarations with the Division, the law also gives the Council the authority to require judges eligible for retention to formally declare to the Council their intent to stand for retention. The Council systematically does just that. After judges declare their intent to seek retention by returning retention questionnaires, the Council conducts an investigation, prepares an evaluation, and, in compliance with the express requirements of the law, notifies the Division of its evaluations of all judges who, in the Council's view, have declared their intent to stand for retention. The state nevertheless argues that the law places the burden on the judge, not on the Council, to make an affirmative declaration; the state further suggests that reliance on the Council's evaluations improperly shifts the burden away from the judge. But since the Council is obligated by law to act on and inform the Division of the judge's declaration, a judge who submits an official declaration of candidacy to the Council meets the burden of making an affirmative declaration no less effectively than by submitting it directly to the Division.

The state also argues that the e-mailed evaluations in question here failed to satisfy the purposes of the statutory filing requirement for various other reasons. According to the state, the evaluations failed to meet the fundamental purpose of authorizing the Director to place an eligible judge on the ballot. But this argument is essentially circular: it assumes that the Director had no authority because the Director declined to view the Council's evaluation as establishing a declaration. As indicated above, this point of view misperceives the law governing the retention process as a whole. Although the Division's uncertainty about the legal significance of the Council's evaluations may be understandable, this uncertainty springs from legal confusion inherent in a retention process that adopts a broad statutory definition of declarations that multiple agencies must apply. Had the Director correctly interpreted and applied the law governing the retention process as a whole, there would have been no basis to conclude that the Division lacked authority to act on the Council's evaluations. The usual solution for confusion created by uncertain legal requirements lies in clarifying the law through judicial interpretation or legislative amendment to avoid future problems-not in disqualifying judges from the ballot.[37]

The state raises a nearly identical argument in contending that the evaluations failed to satisfy a second basic purpose of the declaration requirement: to assist the Division in conducting orderly elections. The state insists that "[i]t is not the Director's responsibility to puzzle out whether" the evaluations amounted to declarations. But again, if a puzzle existed, it arose from the lack of clarity in the statutory language surrounding the current retention process, coupled with the fact that no prior case had ever presented the problem raised here. Moreover, the record hardly supports the state's suggestion that the status of Judges Jeffery and Nolan created an actual puzzle. To the contrary, correspondence between the Division and the Council unequivocally shows that both understood that the retention evaluations covered only those judges whom the Council considered to be "the judges standing for retention."

For example, the Division's Suzanne Mullen showed that she understood this in her June 8, 2004, e-mail to the Council, which asked for "the mailing addresses for the 10 candidates for 2004"—not for the twelve judges who were originally eligible for retention. The Council's Susan McKelvie confirmed this understanding in her June 10 e-mail to Mullen, stating, "I am in the process of creating the pages and will send them immediately after the Council meets in mid-July to vote on the judges standing for retention."

Indeed, it seems difficult to imagine how the Division could have misunderstood that

---

**37.** *See generally, e.g., Div. of Elections of State v.* *Johnstone,* 669 P.2d 537 (Alaska 1983).

the Council had independently asked eligible judges to declare their intent to run for retention. As the state acknowledges in its briefing, the legislature has assigned the Council the duty of "providing evaluations for judges who have declared their candidacy and are therefore qualified to appear on the ballot." Given that the Council must begin its evaluation process months in advance of the Division's deadline for filing declarations and routinely files its evaluations with the Division before the deadline expires, it seems evident that the Council can fulfill its statutory duty only by independently asking all judges eligible for retention to declare to the Council whether they actually intend to stand for retention.

According to the state, yet another purpose of a declaration that the Council's evaluations fail to address is the need for clarity as to the precise date when the judge's declaration is filed. For instance, the state points out that the filing of a declaration triggers the deadline for registering with the Alaska Public Offices Commission. But this argument overlooks the fact that all judges eligible for retention are supposed to have already filed APOC disclosures; and as expressly established on the face of the Council's retention evaluations, the Council checks for compliance with this requirement as part of its background investigation of the judges who declare their intent to run.

The state likewise points out that the filing of a declaration triggers the Commission's duty to inform the Council of disciplinary actions against judges who are up for retention.[38] Yet as already emphasized above, the Commission provides these reports to the Council during the course of the Council's investigation of the judges standing for retention; thus, when the Commission carries out its statutory mandate to report disciplinary sanctions to the Council, it views all judges who are undergoing the evaluation process as already having declared their candidacy—regardless of whether they have formally submitted a declaration to the Division.

The state further maintains that the Council's filing of retention evaluations fails to serve the purpose of a declaration by depriving the public of its right to know who the retention candidates will actually be. The state points out that the filing of a declaration with the Division triggers a ten-day period allowing voters to challenge the declared candidate's eligibility to stand for retention.[39] It argues that if the public does not know who has declared, its ability to challenge the judges will be lost. But this argument yet again presupposes that the Division correctly chose to disregard the evaluations' compliance with the statutory requirement for a proper declaration; thus, the asserted lack of clarity is largely self-created. More importantly, the state's position ignores the reality that the Council's evaluation process is itself a formal, statutorily authorized administrative process that treats the judges who are undergoing evaluation as officially declared candidates and extensively advertises them as judges standing for retention.

Here, because of the widespread publicity the Council gave to the retention process and the open invitation it extended for the public to participate in evaluating the judges who were actually running, by the time the August 1 deadline for filing formal declarations with the Division arrived, the Council had already fully informed the electorate that the judges it was evaluating were officially declared candidates for retention. Likewise, it had already actively encouraged all interested members of the public to comment on the judges' qualifications for continued service in office. Any member of the public wishing to challenge the eligibility of one or more judges would have had ample opportunity to raise the challenge by communicating it to the Council, without having to worry about the time constraints imposed under the Division's regulations.

From the standpoint of the public, then, the judges were officially recognized candidates for retention well before the August 1

---

**38.** *See* AS 22.30.011(h) (requiring the Commission to inform the Council of any public disciplinary actions taken or pending against a judge when "the judge has filed a declaration of candidacy for retention").

**39.** *See* 6 AAC 25.260(a).

deadline. Their recognition became official precisely because of the Council's statutory role in the retention process: by creating this role for the Council, the legislature gave it the primary duty of ensuring that the public received adequate notice of and an opportunity to challenge candidates. The Council performed this role both by identifying and evaluating all judges who declared an intent to stand for retention and by establishing an open and public evaluation process that maximized the electorate's opportunity to comment on and challenge the judges choosing to seek retention. In the context of the retention process as a whole, the Division's regulation allowing a ten-day opportunity to raise a challenge simply duplicates an opportunity already offered by the Council.

The state further suggests that if the Division allowed the Council's evaluation to replace a timely declaration filed directly by the judge seeking retention, its action would frustrate the declaration requirement's purpose of treating all candidates equally; in the state's view, judges must be held to the same standard of compliance as all other candidates. But while this argument is unassailable in the abstract, it overlooks the reality that Alaska's law establishes a judicial retention process that openly treats judges differently than any other category of candidate—both in providing that judges run unopposed on the ballot and in requiring that those who do run for retention must undergo an intensive public process that requires their qualifications and performance to be evaluated by the Council and reported to the public in the Division's Election Pamphlet. These unique provisions in the law pertaining to the judicial retention process account for the differences in compliance that result from the requirements of the process. But at bottom, the same general principle applies here that governs other election-filing requirements: when a required filing is timely, proper in all substantive respects, and deficient only in technical or formal ways that do not impair the requirement's basic purposes and goals, the absence of strict compliance should not bar a candidate from appearing on the ballot.[40]

### 2. The state's remaining arguments are unpersuasive.

Besides arguing that the Council's evaluations failed to serve the basic purposes of the declaration requirement, the state contends that declarations of candidacy made to the Council in November 2003—when the judges submitted their retention questionnaires—would be too unreliable to be acceptable in August 2004—when the Division's deadline for declarations expired. This argument makes little sense: under this theory, a judge's early declaration filed with the Division itself would be equally unreliable and would become subject to question as the deadline approached. Moreover, in asserting that an early declaration to the Council might not reflect "a final decision to run," the state incorrectly assumes that the goal of a declaration requirement is to elicit a "final decision," rather than just a clear declaration of present intent. No declaration need ever be "final" at the time it is made—to the contrary, declared candidates for judicial retention remain free to withdraw from the race and may have their names removed from the ballot unless they act so late in the process that removal is no longer feasible.[41] The state offers no reason to suspect that a judge who decides to withdraw after formally declaring candidacy to the Council would be more likely to withdraw early than a judge who declared directly to the Division.

**40.** *See Grimm,* 77 P.3d at 430; *see also Ruiz v. Sylva,* 102 Cal.App.4th 199, 125 Cal.Rptr.2d 351, 361 (2002) ("[s]ubstantial compliance ... means *actual* compliance in respect to the substance essential to every reasonable objective of the statute" (emphasis in original) (citation omitted)); *cf. Williams v. Clark County Dist. Attorney,* 118 Nev. 473, 50 P.3d 536, 540–41 (2002) (timely petition challenging residency of candidate ruled valid despite lack of supporting affidavit attesting to petitioner's personal knowledge because later-filed affidavit ensured that every reasonable objective of the statute was met and therefore established substantial compliance).

**41.** House Bill 253, introduced May 3, 2007, would fill the current void in the law by providing that candidates for judicial retention may remove their names from the election ballot only by filing a notice of withdrawal with the Division at least 48 days before the election.

As a final point, the state suggests in its reply brief that the Council's evaluation is legally unacceptable as a declaration because the Council lacked authority to act on behalf of the judges. Relying on the Restatement (Second) of Agency, the state insists that, because the judges failed to manifest consent for the Council to act on their behalf in declaring their candidacy to the Division, and because the Council never consented to undertake this responsibility, no viable agency relationship ever arose.[42] But the state mistakenly focuses on the notion of agency by consent—the topic addressed by the Restatement. The Restatement expressly disclaims any attempt to cover agency—like relationships arising by statute rather than by consent.[43] Here, the Council's duty to evaluate candidates and report its evaluations to the Division arises under a specific provision of law; the Council has always interpreted its mandate as requiring it to evaluate only those judges actually "standing for retention"—not all judges eligible to be on the ballot; and judges effectively give their "consent" to have their declarations of candidacy filed with the Division when they submit their retention questionnaires to the Council—thereby authorizing the Council to treat them as declared candidates and to inform the Division of its evaluation of them as candidates standing for retention.

## IV. SUMMARY

### A. Summary of Position on Removal from Office

In short, by choosing to submit the Council's questionnaire, a judge ultimately causes to be filed with the Division an evaluation by the Council that officially confirms the judge to be a declared retention candidate and evaluates the judge's qualifications as a candidate. When timely filed before the August 1 deadline, the Council's evaluation meets the statutory requirement for a timely declaration filed by the judge with the Division. And because it supplies all information required by the Division's declaration form, the Council's evaluation also substantially complies with the Division's required form. Finally, accepting the Council's evaluation as a properly filed declaration does not undermine any purpose or goal of the statutory declaration requirement; nor does it treat judges differently than other candidates except insofar as the law governing the judicial retention process provides for different treatment. In my view, under these circumstances, the judges' failure to strictly comply with the Division's required declaration form did not warrant their disqualification from the ballot.

Accordingly, I disagree with the court's decision removing the judges from the bench. In my view, removal is unnecessary as a matter of law, unsound as a practical matter, and disserves the interests of justice and voters alike. Despite widespread publicity concerning the judges' violations and despite the heavily publicized legal controversy generated by their conduct, the electorate voted to retain both judges by margins that fell solidly within the norm received by other judges on the same ballot. Removing these judges from the bench will nullify the clear intent of a fully informed electorate. At the same time it will deprive the people of Alaska of a resource not easily replaced: the judges' knowledge, experience, training, and judgment. Removal will also needlessly force the court system and the state to absorb the cost and disruption of recruiting, appointing, and training new judges—all in the name of strict compliance. Yet strict compliance is not a goal in itself. And it can serve no purpose as a remedy for inattentive conduct that, by systemic design, had no substantive consequences—and apparently never caused a shred of actual doubt about the judges' intentions to run for retention.

### B. Violations of Judicial Conduct Code/Attorney's Fee Award

By no means do I suggest that the judges' inattention to the Division's formal require-

---

**42.** *See* RESTATEMENT (SECOND) OF AGENCY §§ 1, 7, 15 (1958).

**43.** *Id.* Scope Note at 2 ("Likewise, various cases of non-consensual representation are not dealt with [in the RESTATEMENT (SECOND) OF AGENCY], as where a statute provides that service of process may be made upon a designated public official as 'agent' for a non-resident motorist....").

ment should be condoned. To the contrary, even though their failure to file personal declarations turned out to be merely technical violations, the judges' inattention to the filing requirement nevertheless failed to comport with their ethical duty to maintain the highest standards of judicial conduct.[44] Although the noncompliance here does not warrant removal, I think that it certainly warrants investigation by the Commission and potentially justifies imposition of public reprimand as a sanction. For the same reason, I would conclude that the superior court's award of prevailing-party fees to the judges was inappropriate. Even as technical violations, the judges' conduct raised serious concerns and predictably led to this litigation. Given the novel issues raised by the judges' conduct and the compelling nature of the state's duty to enforce Alaska's election laws, the Division and the state could hardly have been expected to overlook the judges' violations—whether technical or not. In my view,

equity and the interests of justice must bar the judges from recovering prevailing-party attorney's fees, even though their non-compliance does not warrant removing them from office. Today's opinion will require the superior court to vacate its award of attorney's fees to the judges. To this extent I concur in the opinion.

## V. CONCLUSION

For these reasons, I dissent from today's decision ordering the judges removed from the bench but concur in vacating the superior court's award of fees.

---

**44.** *See* Alaska Code of Judicial Conduct, Canon 1.